Please call the next case, ma'am. 212-1178, West Chicago School District No. 33 v. Edmund Garcia. Counsel, you may proceed. Good morning, Justice and counsel. May it please the Court, Elizabeth Capiloutti on behalf of the appellant, West Chicago School District No. 33. It is respectfully submitted that the Commission's decision awarding the claimant benefits under Section 8D1 is against the manifest weight of the evidence and should be reversed. Further, I would submit to you that if this Honorable Court should find that benefits pursuant to Section 8D1 are in fact supported by the record, that they will – that the ultimate calculation by the Commission is neither supported by the facts or the law. Now, relative to an award under Section 8D1, a claimant must establish that due to his injury, he's partially incapacitated from pursuing his usual and customary line of employment and that he suffers an impairment of his earnings. It is fair that based on Dr. Deutsch's testimony that the claimant failed to establish that he was unable to return to work in his usual and customary line of employment as a utility custodian. Dr. Deutsch is the claimant's treating physician, and he testified that on January 29th of 2007, that when he evaluated the claimant on June 12th of 2006, that he felt that the claimant could, and I quote, go back to work, but would have to have lifting restrictions. Dr. Deutsch went on to testify when questioned specifically as to why it was he was imposing a 35-pound restriction, and again I quote, that's a very arbitrary number I came up with. He goes on to state that the point is that he probably can't do very heavy lifting, but he can do most daily activities. Dr. Deutsch went on to testify that following surgery, he anticipated that the – he felt that the claimant would be physically better able and capable of performing his jobs than prior to the surgery. And prior to the surgery, the claimant had a 50-pound lifting restriction. So if we take Dr. Deutsch at his word, he had a 50-pound lifting restriction, which is consistent with Dr. Levy's opinion. Dr. Levy, who evaluated the claimant on the employer's behalf on October 15th of 2007 and stated that the claimant could return to work with the 50-pound restriction. So if you take all of that together, his ability to return to work was not compromised. He was, in fact, able to return to work as a utility custodian. Not as a head custodian, but as a utility custodian. You're not challenging the change in the basic position, are you? Well, no. And I do want to – that was very confusing to me when I actually read the record last night relative to the position as to the utility custodian, the head custodian. And I do want to apologize. I don't think it was clearly stated in our brief. I think when I went back and looked at the record, Petitioner's Exhibit No. 3, and I'm sorry I don't have the actual number, there's a letter from the employer to the claimant. And in the letter, the claimant, it says, we are accepting your request to change to a utility custodian. And we're granting your request. And that would involve different wages, too, though. That would involve a loss of wages, wouldn't it? If he goes from the head custodian to the utility custodian, doesn't he make less money? There was – it was a small diminution of wages, but he wasn't – it didn't take him out of his usual and customary line of employment. Let me just ask this out of curiosity. Are you aware of the first assist case? The first assist case. It's a case where somebody – a woman was an operating nurse. Okay. And an injury, she ended up being a nurse in a different position. We held that was compensable on a wage differential because it wasn't the usual and customary line of employment. Why wouldn't that apply here? Yeah. I know that she went from, I think, being a scrub nurse and she had to go into a much less –  So he goes from being the head custodian to being the utility custodian.  Right. But he also went to being a utility custodian at his own request. I mean, if you actually look at that, that PX3, the document, I know it's not dated, but it says in there, we are granting your request to change to a utility custodian. Now, granted, this was in the time period that you – it was a brief time period that he was off of work, but if you correlate that to the medical records, it says also in that letter that you've gone back to work for two hours a day. If you correlate that to the medical records, that would have been on February 14th of 2001 when Dr. Armaden had released him to return to work for two hours a day. So he actually requested – Ultimately, Deutsch imposed a 35-pound lifting limitation, correct? That is correct. He did. And he – during his evidence testimony, though, he indicated that that was a very arbitrary number. I mean, those were his exact words, that it was a very arbitrary number and that he felt, the testimony was that the point is that he probably can't do very heavy lifting, but can do most daily activities. I mean, he came up with that number to – But why did he claim to lose his job, then? Well, it was based upon the 35-pound restrictions that he came up with. But his testimony when he was actually asked about those – as to why he came up with the 35-pound restriction, he had no basis for it. He said it was an arbitrary number. He felt like it – So you terminated him before that, right? Based upon the initial – yes. Based upon the – I believe there was a form that was filled out which indicated the 35-pound restriction. He tried to get his job back and you denied him relief to reinstate his previous job, right? Based upon the 35-pound restriction, but which was prior to taking Dr. Deutsch's testimony where he clarified the basis of that opinion. So that – I think that given Dr. Deutsch's ultimate testimony that it was arbitrary and that he felt that he could do most activities of daily living, which didn't include very heavy lifting, I believe that based upon his testimony that he didn't lose his ability to go to a usual – And you made that argument before the commission, right? You must have. Yes. I believe that argument was – Commission and its expertise and everything ruled against you. They did rule against us in that. They felt that he had been taken out of his usual customary line of employment. So let me then – if you don't agree with my argument regarding – We're not saying that yet, but go on. Let me move to the next part. Maintain your confidence. Let me make the assumption that you're not agreeing with my argument regarding the AD-1 award. I would submit to you that the commission erred in calculating the AD-1 benefits based upon the claimant's part-time employment. Now, as you said, it became clear that the claimant was not going to return to work for the employer, so he did undertake a job search. While undertaking this job search, he was receiving a disability pension. The claimant testified that under the terms of the disability pension, if he took full-time work, there would be an offset to that disability pension. Therefore, he purposely only looked for part-time work. He did that on his own volitional choice to only look for part-time work. There was nothing about his injury that precluded him to go back to full-time  Let me assume for the sake of the arguendo, is it where you're correct? Let me ask you a point of question. Is there anything in the statute or the case law you've been able to unearth that prohibits the use of part-time employment where the commission finds it appropriate to calculate a wage differential? Is there any case law or statute that says you can't do that? Well, I think that the case that we cited in the brief, the Dutry case, which indicates where you volitionally choose to undervalue yourself, the commission at that point indicated that that because they made a choice not to go back to work. Let's assume a choice, a separate choice. I want to get down to the legal question. Is there anything in the statute or the case law that would prohibit in a proper case the commission from basing a wage differential on part-time employment? On just part-time employment? Because if there is, we need to know that. Well, if the part-time employment is directly associated to the injury, then yes. It could be used. Sure. It could be used in certain circumstances. But in this circumstance, the injury had no bearing on the fact that he chose part-time employment. Part-time employment was his own personal choice because he didn't want to undertake the setup from the pension benefits. And, in fact, he did later testify that at the time that he accepted the job from Sales Link on June 1st of 2007, that there was, in fact, a full-time employment job offer at that same time. But he voluntarily chose to take the part-time job. That part was a little unclear to me. Was he offered full-time work at that time? I mean, you know, the record shows that it was a full-time position available and he only went part-time. Correct. But did he actually have that choice? I believe he did. I mean, I think you can infer that from the record. Does it say specifically, was the question specifically asked? There's no direct evidence that he was offered full-time employment. No, there was not. But it certainly was inferred from the record. And the Commission certainly found that, because in their decision, they certainly denied him benefits during that period of time between June 1st of 2007 and then November 29th, I think, of 2007, when he accessed his full employment. Let me ask you this, Ms. Cappelletti. Did the claimant at the arbitration hearing clearly testify he applied for several full-time jobs, never received any response, applied for a full-time position as a mailroom clerk, he was interviewed, he was not hired? Wasn't that his testimony, that he did, in fact, apply for full-time work? He applied for full-time work after he accessed his early full retirement pension. He did actually testify that there were, I believe, there were two circumstances where he had applied for full-time work. And I think his testimony was approximately a year prior to trial was the last time that he had actually looked for full-time work. So, yes, there is some testimony that he looked one or two times. And it may have been a few more times. I mean, I don't know. I think it was a few more than that. I'm looking at the record. It was a few more times than that. He testified several times. There was a job log admitted into evidence. He contacted at least 20 employers regarding various positions. There was a job log, and I went through the job log, and there were various times throughout 2007, 2008, and 2009. None of the job logs actually, in the job log itself, it did not designate whether or not he was looking for full-time or part-time employment. He did testify that there were a few times where he looked for full-time employment. And I believe his testimony was the year prior to trial was the last time he had actually looked for full-time employment. It was a spirit and wine. But there is some other. It's not fair to say that he voluntarily only looked for part-time employment, is it? I think it is definitely for the period of June 1st of 2007 through November 29th of 2007, he specifically testified that he, in fact, only worked for, only looked for part-time work. And at that time, during that time period, there was, in fact, a full-duty job available to him where he would have been able to earn $15 an hour. That's kind of the rub. I mean, you know, when you say there was a full-duty job available to him, does the record really show that? I mean, it would be different if evidence was presented that he was offered full-time and said, no, I don't want full-time, I want part-time. But all the record shows is there was a full-time job available at this place, but he got a part-time job. Right? Correct. But I think that the record is pretty clear that you can infer from that that the same job was available to him at the full-time basis, and he specifically testified that during that period of time he was only looking for part-time work. So, and I do believe that the Commission actually found that in their decision. I mean, they specifically found that during that period of time, because of the fact he, you know, there was a full-time job available and he only looked for part-time work, they precluded him from actually having benefits. So I do think it goes back to also the actual interpretation. When the Section 81 talks about your average wages, and it's really we're looking at their capacity to earn. What is his capacity to earn over a lifetime? And I think this Court should. So we're looking back to a certain time frame. But by the time of the arbitration hearing, the proof was that he had been looking for full-time work and couldn't find any. Including at this location where he had the part-time job where there had been a full-time opening, and another full-time opening had come up and he didn't get it. Correct. So that was the proof as of the time of the arbitration hearing. So, I mean, do we go back, you know, on one being available he didn't apply for however many months prior and say, now we've got to base your wage differential? Yes. That's what I'm asking you. Yes. And I believe that's the actual way to do it because of the fact that you were looking at his earning potential, his earning capacity. I mean, all of that is always, I mean, we're prognosticating out into the future, right? So it's always speculation. You have to look at the underlying inputs. And that underlying input was that, yes, he did have the ability to make $600 per hour. And ---- $600. I mean, per week. Sorry. Per week. $600 per week. So, yes, it was ---- That was all a utility custodian. I picked the wrong person. You're making a lot of inferences here, Ms. Cappelletti. So, yes, that's what I am saying is because that did, that did establish his earning capacity and it was there that he had that ability and that he voluntarily then chose not to do it because of an unrelated issue that had nothing to do with his work. And that's, I think that that's when you go back to 8D1, and I think this Court recently spoke to it in your United Airlines case, it's at the time of hearing. We have to look at all of these factors at the time of hearing because we can't, I mean, we are speculating. I mean, so we have to look at the underlying inputs as to where we're going to get to in the future. And it's for ---- Well, it's up to the commission to determine the weight of all of this. And you made this argument, right? I think it's more than just the weight, though, because I think it does have to do with the average amount of what his capacity is to earn. And he had ---- But it bears on their finding whether or not he's making legitimate attempts or he's sandbagging. Was he looking for full-time? Was he not? If they would have found he was making no attempts, I suspect they might have ruled in your favor. But there is some evidence in the record to establish, as my learned colleague Justice Stewart alludes to, he was looking for full-time employment. And none was offered to him. And the record doesn't establish that any was available to him. Counsel, your time is up. Thank you, Justice. You can end that note. Yes. Thank you. Please, the Court. Steve Seidman, Ms. Capoletti. A couple of things. One is this period of June 1, 2007, to 11-2507, this was previous to the hearing of January 8, 2010. The arbitrary of the commissioners looked at this and they actually excluded any TTD during that period. And you're right, Your Honor, there was no evidence that he was ever offered any full-time position at Sales Link. In fact, the counsel makes it seem like this guy only took a part-time job for $600 an hour. I like one of those, too. But the bottom line is he had two part-time jobs. He went out at the time of hearing, before the time of hearing of January 8, 2010, went on a job search, couldn't find any jobs that were full-time, including Sales Link, and took two full-time jobs to combine those into one wage. Two part-time. Two part-time jobs. Sorry. And, indeed, the commission looked at that. In fact, Commissioner White's decision is, I think, very descriptive in her analysis of the issues with regard to that time period between June 1, 2007 and 11-25-07, subsequent to that time, is when the job search ensued. And to no avail, unfortunately, for him. As far as the job searches, you're right, the manifest way the evidence clearly shows that the job searches were adequate. The commission looked at it. The commission decided, in fact, that the causal connection was also extant. Moreover, the fact that Dr. Levy testified that, in fact, the accident was a cause of the problems that led to his ultimate fusion and instrumentation of multiple levels. So, with regard to both issues that the respondent raises, the fact is, is that at the time of trial, the evidence was adduced that showed and proved that, number one, that there was a diminishment of earnings and that he could not go back to work doing what he was doing. In fact, he was precluded from doing so by the school district and even asked after their original termination letter if he could go back. And I think the manifest way that the evidence clearly shows that the commission is, the decision should be affirmed. Thank you. Thank you, counsel. Counsel, you may reply. Just very briefly. I think it just would come back again to the definition of average post-injury and his ability to then find his employment. And because of the fact that he chose not to go into a full-time job, I think that that choice had to do with his own personal motivations and not his injury. It should then, therefore, not endure to his benefit. Why did he choose not to go into full-time employment before November? What's the date? November 25th, 2007. Why did he do that? He was on a pension, and that pension would offset any full-time benefits that he should have. But wasn't the evidence that once he went after November 25th, he could earn as much money as he wanted? That's correct. And there would be no offset. Correct. So while he may have been motivated only to work part-time employment up to November the 25th, there is no motivation on the record for him not to work full-time employment thereafter, not a monetary motivation at any rate. Correct. I don't disagree with you on that. And I guess what I am saying is the Commission did not really take into effect that he did have potentially access to full-time employment. And they actually acknowledged the fact that that full-time employment was in job there, because instead all they did was look at his part-time wages, and it was based upon those part-time wages that they ultimately calculated the wage loss. And it ignores the fact that there was, in fact, access and ability to have full-time benefits. Thank you. Thank you, counsel. Thank you, counsel, both, for your arguments. This matter will be taken under advisement and written disposition shall issue.